The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Tim Gabrielson Good morning, Chief Judge Gregory and your honors. May it please the Court and the Council, I'm Tim Gabrielson, I'm from the Federal Public Defender's Office in Tucson, Arizona, and I'm here today along with my co-counsel, Brian Beck and Faye Spence, who are at the Council table from the Western District of Virginia Federal Public Defender's Office. We're here on behalf of Carlos Caro. It's a capital 2255 appeal that was previously before your honors on direct appeal several years back. The issues we intend to argue this morning, well, there are only two issues in the briefs. One is the certified claim that Brady was violated, Brady v. Maryland, was violated when data in the possession of the Bureau of Prisons was not turned over by the government. That would reflect how long Mr. Caro could be, how long Mr. Caro would be required to serve a sentence at ADX Florence, of course, the most secure jail facility in the federal BOP system. The second claim is an ineffective assistance claim that was not certified, but this Court ordered the government to brief it, and so that issue was also joined before the Court this morning. That claim is a claim that trial counsel rendered ineffective assistance where they failed to present mental health mitigating evidence to the capital sentencing jury. I'll start with the Brady claim. Excuse me. The issue really came down to whether Mr. Caro would be incarcerated at ADX Florence for as little as three years, which a government expert, a retired warden named Gregory Hirschberger testified to, or whether he could be housed there longer until, as his experts testified, until he aged out of violence. Dr. Mark Cunningham, who is a psychologist and a prison risk assessment expert going back about 30 years, testified to some anecdotal evidence that he picked up from a BOP official at Florence that many of the inmates there stay there for five years or longer. Mr. Gabrielson, perhaps it would be useful if you would tell us, as a threshold matter, how this Brady claim is substantively different from the Brady claim that was raised on direct appeal. Yes, Your Honor, I was certainly anticipating we were going to get to that. There was no Brady claim raised on direct appeal is the short answer, and let me please explain that. Prior to trial, the defense presented a series of discovery motions to the magistrate judge. One asked for discovery under Rule 16 of the Federal Rules of Criminal Procedure, one under Rule 17, a request for authorization to serve subpoenas for the BOP data, and then the request for any Brady evidence that the government might have. I think it's important. I'm going to go ahead and just read the one sentence from the Brady discovery motion that trial counsel filed. Now comes Carlos David Caro, by counsel, and moves this court to require the government to reveal to defendants' counsel and to permit inspection and copying of all information and material known to the government or under its control, which may be favorable to defendant on the issue of punishment within the scope of Brady. As Your Honors will recall, magistrate judge Sargent granted that the discovery request is to the Brady material, and opposing counsel filed an objection in the district court, and the district court reversed that ruling. When the case went up on, Mr. Caro was convicted and sentenced to death when the case went up on direct appeal. The only issue that was raised with regard to these discovery motions had to do with the Rule 16 and Rule 17 denials, and I put before the court last week, we filed last week a 28-J letter just because I wanted to call the court's attention to what exactly was raised in the direct appeal briefs that were in front of this court, and that was an appeal number 7-5 that Your Honors decided. And in the appeal brief, Rule 16 and Rule 17 claims are raised, and the prejudice argument is simply the one under Section 3595 with respect to harmless error analysis. There was no setting forth of the test for Brady. There was no allegation that there was any Brady evidence that had been discovered that could be raised maybe in a post-trial motion or in a direct appeal. And what direct appellate counsel did was, Your Honor, they included a footnote in which they asked, they said that if the Rule 16 motion were granted by this court, they would also ask that whatever material was produced by the government, that the matter be remanded to the district court so the district court could further decide whether any of the withheld material was Brady material. Mr. Gabrielson, the first time we heard this, we denied relief on the Brady claim on the ground that Mr. Carroll could only speculate as to what the requested information might reveal, and also it wasn't even clear that the Bureau of Prisons maintained that information in the form that Mr. Carroll sought. And we do know, and the Supreme Court has said, that evidence that is simply additional evidence to support a claim is not a new claim. So can you respond to why we can revisit a Brady issue with what appears to be simply additional information supporting the same substantive claim? Well, again, Your Honor, I don't believe a substantive Brady claim was before this court. And I certainly am aware of what this court said in its opinion at 597 and 619. I'm aware of that. I looked at that. I looked at a bunch of cases that this court has decided in this area, and I think the most convincing argument I think I could make to Your Honor, Judge Duncan, is about 10 months after you decided Mr. Carroll's case, the case came before another panel of this court in United States v. King, and it was a similar circumstance where the allegation was that the government had withheld, I think, a grand jury transcript that would have impeached the witness. And the withholding of that Brady evidence went up on appeal to this court, and the court said that the defendant has to make a plausible show where the government possesses the evidence. In other words, it's not something, it's peculiar in the sense that in most Brady claims, the evidence is discovered by the defendant in some other kind of investigative, doing some other kind of investigative function. It's usually not something that's the party's acceptance in the possession of the government. But in that case, the government didn't turn over the documents, and a panel of this court issued a ruling that said that where the government withholds, it would be unfair to make the defendant prove the materiality or even the favorability aspects of Brady. And so the court said that, came up with terminology, I think, different from what this court used. This is Judge Shedd. Let me ask a question. Judge Duncan, if you don't mind, I want to clarify a point. Do you think this issue, no matter what you called it, this information being provided, it was raised in a matter of a discovery issue in the direct appeal? It was raised as a discovery issue. It was, we would, in habeas, we would call it a procedural ruling. Isn't the standard for what is discoverable broader than what has to be turned over under Brady? Yes, it is, Your Honor. So if you lost the substantive, no matter what you call it, as Judge Duncan has pointed out, the substantive issue, it's the same issue, whether the government has to turn over this information about how long people stay in Supermax. That was considered by this court under the more favorable standard for you of discovery, and you didn't win that point, so how do you win a Brady point? Well, Your Honor, the Rule 16, it's considered to be broader than Brady because it also includes inculpatory evidence as well as exculpatory evidence that, if the defendant can show that that information is necessary to his defense. But it's quite apart from the Brady claim because in the Rule 16 and Rule 17 claims that were raised on appeal, those are allegations of simply trial court error and failing to order the discovery requested. The Brady claim is a burden on the government. Even as new evidence might become known to the government, it has a duty to go ahead and disclose that. I know that, but that didn't change the standard under which we review it. Discovery availability is looked at in a much more lenient fashion than Brady material. In other words, the court is more likely under the appropriate standard to allow something to be discovered, but then they can still not be Brady material. So you lost the direct appeal, your client did, on this issue and whether or not the government had to provide it under a standard much more lenient and favorable to you. So how do you win when you impose a tougher standard? Looking at our prior ruling, we did talk about Brady, but even if we hadn't talked about it, it seems to me you get caught in a situation that this court has reviewed this request, and this request is, no matter what you label it, for this information, and we review that under a standard much more favorable to your client and he didn't win. It seems to be a pretty tough burden to win now if you just want to consider it, if we consider it, under the Brady standard. I guess I'm going to respectfully disagree that somehow Rule 16 conferred some greater right on my client to get Brady evidence. I wouldn't agree with that. The burden remains with the government to produce that if it exists. The problem, of course, on direct appeal was, and this court noted it, the defendant couldn't prove that anything that the government was withholding was favorable, and that was part of this court's hold. In fact, that was this court's holding in denying that discovery request. But again, Judge Shedd, I go back to what was actually pleaded in the direct appeal briefs. My predecessors on Mr. Carl's behalf never raised a Brady claim in any fashion. I think they understood that to bring the Brady claim, they were going to have to find the evidence, try to create that evidence that they believe the government was withholding. And they were very clear, it was very clear in a footnote in that direct appellate brief that Carl's counsel filed that they weren't raising a Brady claim. And, in fact, the government, in a footnote in its brief in the direct appeal, conceded that there is no Brady claim being litigated by Mr. Carl in that appeal. The government didn't raise the Brady standard. Nobody cited the three-pronged Brady test in the direct appeal briefs. So the Brady standard was there. The materiality standard was never presented. The defense never said it found some evidence that it could prosecute a Brady claim with. In the 2255, there was a fortuitous circumstance that in another lawsuit in the District of New York that a judge ordered the BOP to disclose records comparable to the ones that Mr. Carl has sought in his litigation. Otherwise, there would be no evidence with which to support a Brady claim. But there was absolutely no Brady claim before this Court on direct appeal, either as a discovery issue or as a substantive Brady claim. Although we decided, as you indicate, we denied relief specifically under Brady. Yes, Your Honor. I mean, I certainly sort of am troubled by that in light of what was presented by the parties. The Court certainly – I mean, I think the Court's decision can be harmonized with the decision in United States v. King that came 10 months later because I think this Court used different terminology. Can or cannot. Can or cannot be harmonized. Well, I think it can be harmonized with United States v. King because I think that's where the standard is, the plausible showing. And all that gets the defendant is the production of the documents for inspection at that point. And so I think that, again, I think the language this Court used in the direct appeal opinion, it sounds like it was deciding a substantive Brady claim. And again, that wasn't before the Court. I think that from my reading of the pretrial pleadings and so forth, I think this Court reasonably believed that because the Brady claim was sort of joined at the hip with the Rule 16 and Rule 17 motions that somehow Carlisle's counsel were bringing those claims along, bringing the Brady claim along with those claims in the direct appeal. But as I said in a footnote, counsel were very careful to tell the Court that it was not alleging a Brady claim, saying that if material was produced pursuant to Rule 16 of this Court on direct appeal or the production of Rule 16 material, Carlisle's counsel asked that this Court remanded the district court so it could assess whether there was also a due process violation under Brady. But there was no allegation that the trial court erred in failing to force the disclosure of the Brady material, and there was no substantive Brady claim raised. I think the second question, Your Honor, was what is it that the BOP had? I believe you asked what is it that the BOP had that Carl wants disclosed. And I think there's no better indicia of that than a declaration that opposing counsel got from a BOP administrator named Joetta Terrell. This was in response to when the magistrate judge ordered the production of the BOP documents. The government got affidavits from four BOP personnel who talked about what's available at the BOP and what's not. And Ms. Terrell, and I think that's at Joint Appendix 118 and 119, she said that the North Central Regional Office of the BOP maintains a log of all of the proceedings that come before her office to determine who gets placed in the ADX Florence control unit and who doesn't. And she listed a bunch of the data that she maintains from those proceedings. And so at a minimum, she has a list of 195 inmates that at the time of Mr. Carro's trial would have been known to the BOP as having gone through ADX placement proceedings, and that information could have been made available by the BOP. Dr. Cunningham later relied on the same affidavit or declaration from that BOP person to indicate that he agreed that there were at least 195 people whose identities were known, which is 195 more than what Carro's counsel knew at the time of the capital sentencing hearing. I think that predecessor counsel in the district court for Mr. Carro, I think, put it well because when the government moved to dismiss the 2255, counsel argued, and I quote, contrary to the government's argument, Mr. Carro did not raise and could not have raised this claim on appeal because it rests on facts outside the appellate record. Again, there really was no opportunity to raise a Brady claim. It was futile, which as this court said then, Carro had not produced any evidence that was favorable to him. And that would have been true if he actually raised a substantive Brady claim on direct appeal. There was just no place to go with that. Anyway, with that said, Your Honor, I see my time has expired. I'll go ahead and save the remaining time for rebuttal. Thank you. Thank you. Mr. Giorno. Please report, Your Honor. My name is Tony Giorno. I'm an assistant United States attorney here on behalf of the United States today. The thrust of the appellant's counsel was the Brady claim. I'll address that first unless the court wishes me to address the ineffective assistance first. Of course, this court is well familiar with the standard that was articulated in previous rulings by this court. What Brady requires is a disclosure of material exculpatory evidence. Mr. Giorno, it would help me a lot if you would speak more directly into your mic. You tend to look down and then I lose what you're saying. I'm sorry, Your Honor. Thank you. I'm sorry. Disclosure of evidence is material where there's a reasonable probability that had the evidence been disclosed, the result of proceedings would have been different. A reasonable probability of a different result is one in which the suppressed evidence undermines confidence in the outcome of the trial. This court, I think, I respectfully disagree with my colleague here. I think this court did, in fact, address the issue of Brady squarely in its 2010 opinion. I think that Judge Jones squarely addressed the issue of materiality in his initial opinion, and he addressed it again in the 2255. The issue of the Brady claim is back before this court, and what they've done is taken some additional what they label as new evidence that relates strictly to the length of stay. Let's assume they could raise that here. Let's assume that constitutes some type of new evidence. Again, we're not waiving at all the issue of whether or not this has already been adjudicated by this court. It is still not material, and it's not material for a number of reasons. The issue of length of stay, contrary to what Mr. Carr has alleged, was not really the crux of the future dangerousness argument in this case. The issue of length of stay, I think if you look at the testimony of all three experts, that being Mr. Aiken, Mr. Hirshberg, or Dr. Cunningham, there were several things they agreed upon. All the experts agreed that ADX is not a permanent placement. No one is intended to stay there. They talked about the fact there are 470 inmates out of a prison population of 185,000. All agreed that the intent is, I believe Dr. Cunningham said this, the goal is you could modify this person sufficiently or get their attention sufficiently so they could be returned to a BOP prison setting. They all described the step-down program. They all agreed it existed at ADX. And again, contrary to the assertions of Mr. Carro, no witness testified that Mr. Carro would be out definitely in three years. I think everyone said they would be dependent on a number of factors. It would be a minimum. But the government argued in closing arguments that it would. It said that everybody said that he would be out in three years. That's what it said. That's a misrepresentation of the experts by what you just said. Is that correct? Your Honor, the Was that a misrepresentation of the record based on what you just said? When you said that, quote, nobody said that he would be out in three years. To say, and it was argued to the jury, they all said that he would be out in three years. That's not correct, is it? That is not correct, Your Honor. But that was the crux of the whole. This case boiled down to what? This is not like Simmons. In some ways, I think it's analogous, but Simmons was a question of whether or not, the court made it clear, you can't prevent them from saying there is no parole, likelihood you won't get paroled at all. This is not a question of parole. I mean, he's never going to get out the rest of his life. The question is, will he be in a less restrictive environment where he might harm a correctional officer or an inmate, correct? That's the issue. But that's really the crux of it, whether or not he's going to, the question is, could he stay there? You're talking about goals, aspirations. What they wanted to establish was that there are people there who have been there for a long, long time and, in fact, stay there regardless of this three-step program. And that's what the government suppressed. And they now know that. And when we had the case here, we said you couldn't establish that it was favorable. But now that would be favorable to that issue, isn't it? Your Honor, I do not believe favorable material from Brady's standpoint. It's not favorable if they're saying you have a way of keeping this man restricted for the rest of his natural life. And you argue, no, we have a three-step program, and he will graduate from that automatically in three years. That's the case. Your Honor, that. That's what you argued.  the closing argument at Citizens? He said that everybody said he's going to be out in three years, and that's not true. Your Honor, the only response I can give to the court to that is that. Respond to the record. Am I correct? Did I misread the record in terms of what the government argued? The only response I can give you to that, Your Honor, is we would never intentionally mistake. No, no. Was that the record? Did you argue that a man's life was on the line and that was a misrepresentation of what the evidence was? Is that correct? It was certainly in part incorrect, Your Honor. But the gist of the evidence was this, and I say this for a number of reasons. First of all, during the court's instruction, instruction number two concerning the evidence, the court clearly instructed the jury that, I remind you, the statements, arguments of counsel are not evidence, and you're to base your argument, your decision only on the. They do that in every trial, every trial, believe me. They always do. But when you're talking about the whole question is, is this, do you have the means of keeping him in? And what was argued effectively was no, because what he said was, I think I'm almost paraphrasing it, the BOP can do nothing about this person. The attorney general can't do anything about it. The only person that controls him is you by killing him.  Your Honor, in fact. Wasn't it argued directly and very directly to them and effectively to them? That was the crux of the whole case. For sentencing, that was the big part, right? It was certainly a part, Your Honor. But keep in mind, the future dangerousness issue was much more than length of stay, Your Honor, and the thrust of the government's argument was only in part that he would be stepped out of ADX. But the gist of the argument, if you look at, again, the court's instruction number six, that defines issues of future dangerousness. It's a function not just of length of stay. The government relied upon, and the jury found that, this is instruction number six, dealing with future dangerousness. The following aspects of future dangerousness are alleged by the government. Continuing pattern of violence and recidivist conduct. Low rehabilitative potential, which includes, among other things, Mr. Carl has demonstrated that the threat of incarceration does not deter his misconduct. But, Counsel, what you're doing, you're arguing in my favor. Because what you're saying is that all of that augurs exactly why they can keep him in there. For all those reasons, you're right, it is undisputed that he's dangerous. Undisputed this was a vile type thing. In other words, for the defense, that shows that they have, that's why this evidence is crucial, because it shows when you have this type of special person, and evidence came, was it silver? Silver stamp. Right? Yes, sir. When you have that, you conceded that, well, that's a special case. Well, why isn't this a special case?  But instead, the government argued, no, in three years, we have to let him not out, but to a less restrictive environment. This is the case. This is the sine qua non of this case right here. And that's where they were able to argue. And we know now that that's not the case. And when it came here, we said he still could not show favorability. And that's what it was based upon. And we still locked it, and I still don't understand how in the world, under Rule 16, I mean, we just started talking about conflating favorability with materiality. It doesn't have to be favorable, does it? It doesn't say it's material to preparing one's defense. As Judge Shadd pointed out, it's, well, how does that knock down because you can't show his favor? All of that was denied, wasn't it? Even Rule 16, 17. What's correct? Your Honor, I think that, yes, it was denied. And the reason for the denial was that if you look, it was more than, what they were asking for was more than just length of stay in their evidence. They wanted records of all the assaultive conduct and all the other things. And, of course, in any case, a particular capital case, the issue of what's an appropriate punishment is an individualized decision. So would we then have to go back and look at all the cases, the host of cases, and say, well, why is he not like Silverstein? Why could he be stepped out to someplace else? Why is he more like inmate A who might have been stepped out? It involves a process that is, and there's no indication that that's where the lack of favorability would come into. The length of stay, I think, Your Honor, despite the argument about length of stay, I think we all agree that the three experts all said that the length of stay depends on the individualized acts of the defendant. Things are both known and also unknowable. A large part of it is what will this inmate do? Carlos, Carl, what will he do? And I think it's in your- We already know what he did. But in terms of in the future, Your Honor- But I'm talking about isn't he a special case? To eat someone's breakfast and then wind up killing the person. You ate his breakfast, and you ate him, and then you call the people in and say, come here, get this piece of, you know, he's stinking up the place. I mean, is that not a special case? I mean, on one hand, you're arguing you should kill him because he's very vile and very dangerous in the future. But you know what? We have to let him go, though, because we have a step-down program that would make it mandatory to let him go. So you can't have it. You can't get either two. And then keep the evidence from them. You deny the discovery. And now we know it was suppressed. And it's a perfect storm in terms of the justice, in terms of that's the whole idea, what Fermi, Georgia, was looking at in terms of these death cases. You control everything. You control the evidence that shows you that you could keep him longer. Not only be longer than three, but you could keep him in max forever, as long as he lived. You couldn't. You couldn't. And I think you're right. That was a testimony. That was, in fact, a testimony. We couldn't keep him there forever if he was, in fact, that special case. But I don't know whether he's a special case or not. The Bureau of Prisons don't, as we sit here today. We don't know if he's a special case. Could I go back to sort of the, for framing this issue, do you agree that this was the crux of the sentencing? No, I don't, Judge Duncan. In fact, during the sentencing phase of his trial, nine out of 12 jurors found that if not sentenced to death, Carroll would spend the rest of his life incarcerated in a secure federal institution, i.e., Florida, Florence Ad Max. So they knew, and everyone, every single one of those jurors, despite knowing that he was likely to spend the rest of his life in a secure federal institution such as Ad Max, he's still likely to commit acts of violence against other inmates or staff. So for at least nine of the 12 jurors, BOP data that he would likely spend more than three years at Florida's Ad Max would not have affected their finding of future dangerousness. So there's a distinction between how long you're going to spend at Ad Max and a finding of future dangerousness. How long you're going to spend at Ad Max is a part of it, but it's not the totality. That, and Judge Duncan, that is exactly my point. Judge Gregory, to your point, however inartfully the closing argument was, and certainly I can't hide behind something that's, or try to make the record something that's not, I'm not even going to try to do that. It was a poorly made argument. But it was, the jurors heard all the testimony of the three experts, and by this special verdict form that Judge Duncan cited, we lost that point. In effect, nine of the 12 jurors found that, and to quote, if not sentenced to death, Mr. Carr will spend the rest of his life incarcerated in a secure federal institution. And the gist of that was, whether it's Ad Max, whether it's Marion, whether it's pick an institution, the ability to control him in a secure facility didn't appear to be dispositive of the future dangerousness issue, which instead turned on some of the other factors that are identified in instruction number six by the court. It's like saying, you know, you poke the person's eye out and you blinded them and said, well, you know, you're responsible because you bumped into all the furniture. You didn't give them the evidence. I guess nine out of 12 may have. You didn't have the evidence in terms of what you could have done.  But the point is, it was inappropriate to represent to the jury that this man would be out, and you had no basis of keeping him in beyond three years. Except that nine out of 12 people said it wouldn't matter. If he stayed in for Ad Max for the rest of his life, it wouldn't make a difference in their determination. I mean, that's the materiality point. And that is my point, Judge Shunkin. That is my point. There's – I know this court has read all the testimony of Dr. Hershberger, excuse me, Mr. Hershberger, Dr. Cunningham, and Mr. Akin. Those were the three BOP experts. I think Mr. Akin, who was one of the defense witnesses, said it best. Whether the Bureau of Prisons has the ability, they have the will, to basically make this person conform, make any inmate conform to the rules of behavior, if you will, within a BOP and securely house him. And that is exactly what at least nine of the jurors found. If nine of the jurors found that, that still was not enough to overcome their decision that he was going to constitute a future danger because of the other factors that were identified by the court. And that was the – notwithstanding the closing arguments made by counsel, that is – that was the evidence. And the jury so found – the jury, in essence, rejected the government's arguments in that regard, and they still found future dangers. But in terms of the jury having a good understanding of what that meant, who gave them that? That's decided. Read again the instruction you said that Judge Duncan told you about, 9 to 12. It says over here, the mitigating factors the defendant contends to prove by prudence of the evidence are, if not sentenced to death, Mr. Carr will spend the rest of his life incarcerated in a secure federal institution for the rest of his life. In a secure – say it again? Secure federal institution. And you think that describes exactly what it would mean that the ability you have to keep him – I mean, every prison is a secure – isn't it? Isn't a prison – every prison secure? It's a secure facility. I mean, it begs the question. It's a secure facility, Judge Gregory. And obviously, we all know, and all the – the experts said, nothing is fail-safe, despite their best efforts. I know that, but you talk as if saying that to the juror, the juror automatically knows that it's a secure – in other words, there's no discovery to determine what that means. For example, there's some – whether it's going to be secure when you have 10 hours of rec per week, five, or you're going to be out in three years, or what. That's what discovery is, and that's what they were entitled to in terms of preparing themselves for this kind of evidence. Why did the government withhold it? Why did you fight tooth and nail, all this we have now that you had in your possession? Why did you – why did – isn't that – wouldn't that be relevant and material as to that? And so they can argue that? And let me tell you now we know what it would mean to just to say secure. They'd say the same thing you said. Yeah, every prison people can get out of. They're all secure. That's why I read the other day somebody got out of one. But to be able to have – that's what they want to discover so they can see what this means and the number of people who have stayed there in that facility, in that circumstance, and that's what you kept from them. Your Honor, there – And it's not enough to just say that nine people under that suppressed lack of knowledge understood it that way. When that was designed by way – and that's why you said in closing argument, he's going to be out in three years and nothing we can do about it. And that becomes the definition for the jury as to what is a secure – that's the whole point. You can't just get around it when you suppress it and say we can't look at it again. And Brady doesn't even fit in the scheme of these type cases. That's like saying, well, we've heard Brady already, but now we've found out that they suppressed evidence that wasn't in their fingerprints. Well, we've done it before now. Brady doesn't even fit. That's why King – the King case, we said that when you're talking about this. I mean, I just don't understand how – I mean, I know the government wanted this man to die. Your Honor has understood. I mean, I argued very clearly and said the only way we can do it is you can kill him. But there's got to be a process. That's what the Supreme Court said in death cases, a fairness of due process. And let the truth be known. If there's no way you could control him and he'd be out in three years if that was the case, then fine. Let that be. But not let him go to the gallows when you have evidence that you can keep him longer. And you can define it if they had to discover what it really means and not just saying, you know, secure. Because you're right, Jersey. Okay, secure. Everybody's seen Escape from Alcatraz and Birdman, all these kind of things. They know it's a sin. But they need to understand that, and you kept that from them. And that's important. And that's why the courts are here, to do justice. I understand, Judge Gregory. But I honestly and truly believe, notwithstanding the argument of counsel, the jury got it. The jury understood the evidence. The jury understood everything about Mr. Carro. And in looking at the other factors that inform future dangerousness, that is to say ongoing recidivist behavior, the theme of the government's case with regard to future dangerousness was, and for the death penalty, was every time Mr. Carro, that the Bureau of Prisons tried to control him, they were unsuccessful. He starts with the riot in Oakdale, Louisiana. He then goes to the USP. He stabs Benavidez. He then strangles his, in the shoe, the most secure part of the institution. But even then, the jurors still found and understood, none of them found that the Bureau of Prisons could still secure him for the rest of his natural life, but still found future dangerousness. From a materiality standpoint, the new evidence is nothing more than a collection of data. I think Judge Jones pointed out that this is something that, if in fact it was out there, it existed at the time of the trial in 2006, 2007. They made no effort to try to locate this. As Judge Jones said, if he would give me this, it might have informed my decision concerning discovery. But the point of the matter is, at the end of the day, the jurors, by their verdict, and on this finding of this mitigator, said, length of stay is not going to change the outcome of this trial and this sentence. So that would be our position on that. Now I do have, I can prepare, I know no one has asked about the ineffective assistance of counsel part of it. We briefed that very thoroughly. My red light is on. I'm happy to answer any questions the Court might have, or I will defer to my colleague from the Public Defender's Office. Thank you, Mr. Giorno. Mr. Gableson. I can't put it any better than Chief Judge Gregory just did with respect to what the government was arguing with respect to the three years. They elicited the testimony from Warden Hershberger that it was three years. In closing argument, the two prosecutors on the case once said, and I quote, you heard the testimony of Mr. Hershberger, three years. Three years for him to be stepped out of ADX and into a USP, close quote. In rebuttal closing argument, quote, you decide, is he going to get out in three years, as Warden Hershberger says, or is he going to get out in five years, as Dr. Cunningham says? Of course, what we know now is that it wasn't the rare example of a guy staying past three years, or what Cunningham could only call sort of the regular amount, that it would be five years. What we know now is that one inmate was there for 27 years. Three inmates were there for greater than 18 years. 155 inmates were there longer than five years. And so I think it's disingenuous for the government to make an argument that the jury had all the information it needed to sort this out. The other thing is the jury instruction in the verdict. Mr. Carr was held in what was supposed to be a secure facility, and he committed a homicide there. These institutions are not fungible. ADX Florence is a special unit. At the time of what we know now from our very late evidence we got from the New Mexico law firm and such, 54 inmates were being housed at ADX Florence at the time of Mr. Carr's trial. Fifty-four inmates who had committed murders within a BOP facility were being held at ADX Florence. There had only been two murders at ADX Florence since it opened, and both of them involved cases where inmates were in a rec yard unrestricted. The policy has since been changed, but there were 54 people who committed BOP murders that were housed there, and there had been no other acts of violence. So ADX Florence is the gold standard in terms of keeping people from committing violent crimes. But I do have, I think, to get back to the race judicata issue that Judge Duncan pursued early. Of course, we don't call it race judicata in habeas corpus. We call it abuse of the writ. And the abuse of the writ is to keep people from either sandbagging claims, raising a claim in a proceeding that loses and then raising the claim again later, or foregoing a claim and sandbagging you with the same evidence and trying to present the claim later. The problem here is Mr. Carr's lawyers did not raise any form of a Brady claim before this court. They put in a footnote that said, if you're going to make the government turn over the Rule 16 evidence, we'd also like this case remanded so the district court can judge whether there was also a due process violation based on a violation of Brady. There was no Brady evidence in the record. They couldn't pursue a Brady claim. And I have to just respectfully disagree, I think, with you, Judge Duncan, that there was a Brady claim raised. There was no Brady claim raised. And I think, as I said, I think your honors can carbonate. Would it be fair to say that the court thought there was a Brady claim? Yes, I think that might be fair to say that. And assessed it as such? Well, the panel majority did assess it as such. And there was no dissent on that issue? I don't remember if Judge Gregory dissented on that or not. The dissent was on whether the statutory mitigating factors violated the Eighth Amendment. Right, because he was doing life in prison for three nonviolent drug offenses when he got recruited into the gang and the violence followed. But again, your honor, the race judicata rules, just for shorthand I'll call it that, it's really abuse of the writ that's meant to keep defendants from getting second and third bites of the apple. We all know that. But why penalize Mr. Caro by saying that he abused the writ here when his lawyers didn't raise anything akin to a Brady claim in that direct appeal?  Let me ask you a question. I'm going to go back to this questionnaire that the jury answered. I want your understanding of it. On secured facility, you know, we tell the jury there to use their common sense. Is it your argument that when the juror looks at that secured facility, that secure doesn't mean anything to them because everybody knows every facility is secure? So that's just a throwaway word? That seems to be your argument, that every facility is secure. But in the context of this case, I'm just wondering about your argument on that point. Doesn't secure in the context of this case almost certainly talk about Supermax in Florence? No, your honor. I don't think a lay juror I don't think can be understood to understand those distinctions and how the BOP houses inmates. No. You don't think, I'm going to get this straight, you don't think a lay juror understands that every federal prison is secure, so you don't need to put that word in front of it? You think a lay jury thinks that there are not secured federal prisons that people can just come in and walk into and walk out of? You don't think that, do you? Judge, Mr. Carro committed a homicide, and what the jury would have understood to be a secure facility at USP Lee, I think that without No, but you just said secure, every prison is secure, following up on what Judge Gregory said. Well, don't you think if you took that word secure out, if you were just talking about general prisons, and you go that he can be held in a federal prison facility, everybody would know that's secure. You don't have to add that word in there, do you? I would disagree, your honor. I don't think lay jurors will understand that to mean what that is. Just in the media, there are reports all the time of prison homicides, federal prisons, state prisons, whatever they be. No, no, no, I'm talking about secure. Everybody understands. Don't you think every juror understands a federal prison facility, everyone can be called secure. Everyone's understood to be secure. But secure, with the adjective being used here, it means something of the context in this case, which is really, really this secure place. Because the testimony was about Florence. You don't think the jury is smart enough and the average person is smart enough to understand that reference? The government's expert witness told this jury, your honor, that he would do three years in that most secure institution. No, no, no, you're not answering my question. My question is, and if your answer is you don't think an average person would understand that every prison in the federal system is generally secure, then you don't think they do. That's your answer to it. I was just asking what you thought. I don't think they have a base. I think they're well-intentioned trying to do the right thing in the sentencing, but I don't think they have enough information in front of them to know exactly what the circumstances would be. Despite all the discussion of Supermax. They didn't make that association. Your honor, that was blunted by the testimony of Mr. Hershberger and the closing argument that I read. Well, there were differences of opinion, but the jurors heard the discussion about length of stays in Supermax. They understood the distinction between where Mr. Carroll was and, in contradistinction, a more secure facility. I think that's what Judge Shedd's question is getting to. Well, and I'll say this as well. I'm not sure that the jury, even after that discussion, even putting apart the testimony about three years, I'm not sure that the jury necessarily understood exactly what the circumstance would be, or, again, without the data that would support the proposition that ADX would be a place where Mr. Carroll would be unlikely to be able to commit a violent act. Again, that's the crux of the Brady claim, is the jury didn't have that information that would have fleshed out those details. What they didn't have was information about how long he would stay there. Correct, but there was no indication that that's where he was necessarily going to end up. That wasn't something that the district court would impose. My point is, that's presumed in that inquiry of the jury. In the context of this case, Judge Duncan has it exactly right. There's an argument. You're arguing about whether or not the testimony was that he would be in that secured facility forever. But my question was, isn't it relatively clear? I think it is. That secure in that question meant supermax. And they, quite frankly, I don't think they believed. Maybe they didn't believe the government attorney, and maybe they answered this question in part to let the government know the government was misrepresenting what they understood the evidence to be. But notwithstanding why they did it, they indicated even if he were to be in the secure facility, which I think is almost certainly clear they're talking about supermax, that it still didn't matter to them. You're arguing about a different point. I was arguing about what secure means, and I think it's pretty clear that secure here, based on everything that you had asked, is reference to supermax in Florence. Now, the length of stay and all, there's discrepancies. The government maybe shouldn't have argued that or misstated. But the question about what the jury understood and thought about this person, they presumed that even if he could stay there forever, there was still a problem. Nine out of 12 did. It seems to me it kind of answers that question. I can understand maybe you don't think that. Well, Judge, I have a problem equating the adjective secure with necessarily meaning what the jurors just heard about the ADX Florence security envelope and so forth that was testified to. I think the problem with this case is it's amazing how the truth, I mean, it's almost as if the truth is dangerous in these cases. Just tell the truth about it. Here's the problem with it, and I understand what Judge Duncan and Judge Sherr are saying in that secure comes with it. But the problem is this. Secure, as defined for this jury, I'm sure, is just so unraveled and so ambiguous here is that they have defined secure has to be at least, even if you're there, you get to be around 15 people. For example, so if you get stuck at three and never graduate. But when the proper discovery is that some people never get past one, which means no contact. So even if you say secure that, it's not enough detail in terms of discovery here whether people have to either be allowed to get to two and three. That's the intellectual dishonesty and problem with this case, is that it's understood that, well, you've got to get secure here, but there wasn't no contact. The point is this. The government could have kept him at step one, which is a special case, but the state was told, no, there's nothing we can do. He gets to this point. Am I correct that if you get to two, what, seven people you can be around, right? You get to three, you can have 15. What the jurors said, even a secure one doesn't give them that. That's the problem. If the truth be known in terms of fully, people may not be allowed to even get to even complete, so it's told I have to let them get there. And until you allow discovery appropriately in terms of due process to say a person, well, the juror would have understood. How could they understand that when the evidence clearly is conflicting on how many people even in a secure place he would have? That's why they said, well, if this is secure, the way I look at secure, that's 15 people that could be at risk to him. And they understood that. I care about human beings, whether they're inmates or not. But if the truth is, no, we can keep him from anybody, no human contact, control, I mean like marrying type stuff, you know, six, then that's a different matter. And the truth comes out by, say, a discovery in a case like this. And in the Arkansas jury, the only thing we can do is the only thing we have to do, nobody can do anything, DOP, attorney general, except for you to kill him. And say that didn't matter in this case because we could look at words and fill in gaps that are clearly not in the evidence for no reason at the fault of the defendant. And that is inconsistent with justice and not just a rush to kill. I couldn't agree more with Your Honor on that. And if we went back to the pretrial, the pretrial hearing where this first was discussed on November 3rd, 2006, where Judge Sergeant, Magistrate Judge Sergeant, asked the government specifically, isn't it true that if you had evidence that she used the words refute or reject this evidence about the three years, wouldn't that be something that's exculpatory? And twice in the same colloquy, the government admitted that, yes, that evidence would be relevant to this decision. That would be exculpatory. And that's in part why Judge Sergeant ordered the evidence produced. When the government got in front of the district court a couple of weeks later, the government took a new tact and said the evidence wouldn't be exculpatory. I would invite Your Honors to look at those discrepancies. You can't make those inconsistent. Again, as Judge Gregory said, there's a life at stake here. Why can't we get it right? Why can't we get an accurate and reliable death sentence, which is what Furman and all the cases that have succeeded it require? Woodson v. North Carolina, Skipper and Simmons, which originated in this circuit back in the day, all those cases speak to the need for relevant, reliable sentencing information. That's certainly not what Mr. Carver's jury had here. Well, you're well past your time. Unless you had some 30 seconds to say it, I'd cut you off in a thought. But you will have to end some point. Yes, Your Honor. Mr. Giorno made just a passing reference to the ineffective assistance claim. We were engaged with Your Honors on the Brady claim. But I would just emphasize with respect to the IEC claim, you have a situation where defense counsel made a judgment not to put on the mental health report of the two government experts, which were available under Rule 12.2C3. They could have noticed that they were putting on that defense. They could have reviewed the government's reports and then declined to put on the mental health evidence and kept it out. The rule allows that. There's no case law to the contrary. And I think Mr. Carver was prejudiced by that as well because he had organic brain damage. He was diagnosed by two experts as having organic brain damage that caused cognitive dysfunction that impaired his ability especially to think and function under stressful circumstances. And having the inmate put in his cell at USP Lee after the prior day he declined, the etiquette in the prison was the guards would ask the inmate, can I put this guy in your cell? And if it's declined, if there's another open cell, they put the inmate in that cell. Carver declined that particular inmate. The next day they came back and they put the same inmate in the cell with Mr. Carver without explanation as to why the etiquette was being overruled in his particular case. And, again, he's a guy that functions as a 10-year-old with regard to cognitive function and even lower when he's under stress. And we would submit that that mental health evidence was extremely important to get in front of the sentencing jury for those reasons. Thank you for indulging me these extra minutes, Your Honor. I appreciate it. Counsel, why didn't you ask for 30 minutes? I guess I foolishly thought that 20 minutes would be sufficient, Your Honor. I would think in a capital case it might be a good idea to ask for 30. I would have thought there would be denied. We'll come down and greet counsel and proceed to the next case.
judges: Roger L. Gregory, Dennis W. Shedd, Allyson K. Duncan